Receipt number 9998-4617525

UNITED STATES COURT OF FEDERAL CLAIMS

**FILED**
APR 20 2018
U.S. COURT OF
FEDERAL CLAIMS

GEORGE
KARADSHEH ,

           Plaintiff,                  Case No.   **18-571 C**
                                          Hon.

        v.

THE UNITED STATES,

           Defendant.

_____/

## <u>COMPLAINT AGAINST THE UNITED STATES FOR PLAINTIFF'S SHARE UNDER THE FALSE CLAIMS ACT</u>

    Plaintiff/Relator ("Plaintiff"), George Karadsheh, files this Complaint Against the United States for a Plaintiff's Share under the False Claims Act. Plaintiff respectfully requests this Court grant judgment against the United States in the amount of $980,000 dollars.

### <u>INTRODUCTION</u>

    The instant action is before the Court because, simply stated, the United States government refuses to pay Plaintiff George Karadsheh a share of the monies collected from Defendants in the underlying *qui tam*/False Claims Act case.

    Specifically, on August 5, 2013 Plaintiff filed a *qui tam*/False Claims Act case against a number of Defendants, most notably the infamous "cancer doc" Farid Fata. Another Defendant identified by Plaintiff was Crittenton Hospital ("Crittenton"), where Fata worked, leased office space and had clinical privileges. Plaintiff provided the government with information about Crittenton's improper and fraudulent conduct involving Fata.

1

In 2014, Fata pled guilty to thirteen counts of healthcare fraud, two counts of money laundering and one count of conspiracy to pay and receive kickbacks, stemming from his practice of intentionally misdiagnosing patients to fraudulently bill Medicare.  Fata told patients that they had cancer and subjected them to chemotherapy when in fact the patients did not have cancer.

In July of 2015, ostensibly due to the publicity arising from Plaintiff's disclosures and lawsuit, and **after Plaintiff advised the government of Crittenton's fraudulent involvement with Fata,** Crittenton made two separate so-called *self-disclosures* to the Department of Justice and to HHS-OIG, resulting in payments of nearly $4,000,000 by Crittenton to the government. The government acknowledged its obligation to pay, and did pay, Plaintiff a share of $700,000 of the payments, but refused to pay on the balance.

This action seeks a Plaintiff's share of the remaining portion of those payments.

## JURISDICTION AND VENUE

1.     This action arises under 28 U.S.C. § 1491 *et seq.* as this court has the authority to render any judgment against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

2.     The previous action arose under 31 U.S.C. § 3729 *et seq.*, also known as the federal False Claims Act (the "FCA"), the Michigan False Claims Act and the common law to recover treble damages and civil penalties on behalf of the United States of America arising out of violations of the FCA.

## CASE BACKGROUND

3.     Plaintiff George Karadsheh ("Plaintiff") has been an invaluable asset to the Department of Justice and the American public for the past five years, helping to expose one of the largest and most troubling *individual* practitioner healthcare fraud cases in American history.  In total, the United States Attorney's office estimates that Farid Fata ***fraudulently*** billed nearly $35,000,000 to Medicare and *harmed* hundreds of patients -  in a scheme former United States Attorney Barbara McQuade described as "the most egregious" health care fraud case her office had ever seen. The media coverage surrounding Fata's atrocities has been extensive, and continues to be discussed in countless articles, new segments, and even on prime-time television including the programs *American Greed*, *Nightline* and *Dateline Sunday.*

4.     Under the False Claims Act, Plaintiffs are entitled to receive *at least* 15 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution. 31 U.S.C. 3730(d)(1).  However, in the instant case, Plaintiff received only **10 percent of the proceeds** of the action to allow more compensation to go to the victims of Farid Fata.

5.     As described in further detail below, Plaintiff learned that Crittenton Hospital made two separate (alleged) *self-disclosures* to the Department of Justice and to HHS-OIG, involving illegal business dealings with Fata, resulting in re-payments of nearly $4,000,000 by Crittenton to the government. Plaintiff's complaint centers on Crittenton's 2015 self-disclosure because the government paid Plaintiff a portion of Crittenton's 2016 self-disclosure.

6.     For background purposes, on March 1, 2016, Crittenton disclosed the existence of improper lab arrangements to the DOJ, which led to an eventual agreement with the U.S.

Attorney's Office for the Eastern District of Michigan. This agreement resulted in an approximate $791,000 settlement.

7.      Specifically, Crittenton disclosed that from April 2011 to August 2013, Crittenton had an illegal arrangement with Fata's practice involving the transmission of laboratory testing requests.  Crittenton acknowledged that Fata ordered medically unnecessary tests.  As a result, Crittenton repaid the government $791,000 for wrongfully received billing payments.

8.      Under 31 U.S.C. § 3730(c)(5), Plaintiff received a reward of 20% of the *Alternate Remedy* amount paid to the U.S. Attorney's Office of the Eastern District of Michigan by Crittenton.  To receive the 20% Plaintiff's share, Plaintiff and his counsel agreed to drop a pending *qui tam* suit, because the government choose to pursue the disclosure to the DOJ as an *Alternate Remedy* under the FCA.  At the time, Assistant United States Attorney Brandon Helms assured Plaintiff that dropping the *qui tam* action would not preclude Plaintiff from later claiming a reward from Crittenton's so-called disclosure to HHS-OIG.

9.      Following the 2016 disclosure to the DOJ and based upon Crittenton's so-called *self-disclosed* conduct to HHS-OIG in 2015, Crittenton paid an additional **$3,274,153.90 to** HHS-OIG in Civil Monetary penalties due to another inappropriate financial relationship with Fata.

10.     Upon investigation, Plaintiff learned both self-disclosures (2015 to OIG and 2016 to DOJ) were related to information *he previously provided to the government*, verbally and through memoranda.

11.     Nonetheless, and after paying Plaintiff 20% of a portion of Crittenton's payment to the government, the government will not award Plaintiff his rightful share of the balance of Crittenton's 2015 self-disclosure payment.

## PLAINTIFF'S CLAIM AGAINST THE UNITED STATES FOR PLAINTIFF'S SHARE

## 2015 OIG Self-Disclosure

12.   In July of 2015, then unknown to Plaintiff, but nearly two years after Plaintiff alerted the government to Fata's exploits at the Crittenton Cancer Center and elsewhere and after Fata's very public arrest and subsequent guilty plea, Crittenton belatedly *disclosed* to HHS-OIG, its Stark Law violations in relation to Fata.

13.   Although originally Crittenton was not named as a defendant in his 2013 *qui tam* suit, Plaintiff, on several occasions, apprised the government of his concerns surrounding Crittenton and the hospital's improper conduct.

14.   On November 23, 2015, after providing the government with information, and without knowledge of the then confidential *self-disclosures*, Plaintiff filed a Second Amended Complaint naming Crittenton as a defendant for failing to timely identify and refund (under §6402 of the Patient Protection and Affordable Care Act) overpayments to the government after Fata was arrested and pled guilty.

15.   The timing of Crittenton's eventual disclosures to HHS-OIG illustrates a gross neglect in Crittenton's investigation of the entity's relationship with Fata.  The disclosure to HHS-OIG was not made until 2015 -- two years after Fata's very public arrest and despite knowing that Fata leased space from Crittenton for his main clinic and had numerous business relationships with Crittenton.

16.   Crittenton's extensive and prior involvement with Fata (as clearly admitted and acknowledged in both disclosures) obligated it to identify and investigate its conduct under Section 6402 of the Patient Protection and Affordable Care Act.

17.    Despite previously compensating Plaintiff for much of his information (2016 DOJ agreement), the government claims that Plaintiff is not eligible to receive a percentage of Crittenton's payment to HHS-OIG (2015 disclosures) because Crittenton was not named as an *initial* defendant; however, Plaintiff's confidential Second Supplemental Disclosure Statement, dated May 21, 2014, discussions between counsel and AUSA Joan Hartman around April 9, 2014, Plaintiff's interview with the Federal Bureau of Investigation (FBI) on August 28, 2013, delivery of emails involving Dr. Fata which illustrate a kickback scheme between Fata's investment group, CIG and Crittenton, as well as a textual analysis of relevant case law, informed the government of Crittenton's misdeeds and involvement in fraud ***before*** Crittenton was accepted into the Self-disclosure Protocol by HHS-OIG.

18.    On May 21, 2014, a year after Fata's arrest and a year before Crittenton's disclosures to HHS-OIG, Plaintiff's counsel prepared a confidential Second Supplemental Disclosure Statement which outlined Crittenton's improper involvement in Fata's atrocities.  In the document, Plaintiff expressly detailed how Crittenton failed to investigate Fata, despite having numerous and obvious opportunities to do so, through Tumor Board Meetings and when Fata's patients were admitted to Crittenton Hospital Medical Center.  Plaintiff also provided information that radiologists and pathologists at Crittenton were likely complicit with Fata's crimes, as they confirmed cancer diagnoses that were not supported by any evidence in the medical record, or otherwise.  The Supplemental Disclosure Statement also foreshadowed the improper relationship Fata had with laboratories.  Consistent with the admissions in Crittenton's disclosure in 2016, Plaintiff's Disclosure Statement dedicates a section to "Diagnostic Testing and Treatment Center's Involvement," and states that the labs continued to

process medically unnecessary tests from Fata's office, despite having absolutely no evidence that the patients were diagnosed with cancer.

19.    Plaintiff's argument that the Department of Justice was aware of Crittenton's misdeeds, due to the information provided by the Plaintiff, is further evidenced through a conversation between Plaintiff's counsel Maro Bush, and Assistant United States Attorney (AUSA) Joan Hartman.  Maro Bush discussed the involvement of responsible hospitals and pharmaceutical companies with AUSA Hartman around April 9, 2014. Although AUSA Hartman declined to accept additional information at that time, Bush states that she and AUSA Hartman went over a list of information comprised of information from emails that the Plaintiff had sent detailing possible illegal conduct by the hospital.[1]

20.    Earlier still, Plaintiff met with the FBI on August 28, 2013, and spoke with agents regarding a possible kickback scheme between Fata and Crittenton employees. During the meeting, Plaintiff advised of his suspicions about a possible kickback scheme between Fata, Crittenton, and another entity and other improper financial arrangements between Fata and Crittenton.

21.    Thus, Crittenton had adequate notice to identify and investigate its relationship with Fata after his arrest but did not do so until almost two years later (initiated by a due diligence review in connection with an acquisition) and after Fata pled guilty, Plaintiff filed his Second Supplemental Disclosure Statement and Second Amended Complaint *months before* HHS-OIG *publicly* released Crittenton's involvement in the SDP program, and Plaintiff expressly told federal agents in 2013 that Crittenton employees received kickbacks .

---

[1] Plaintiff's Counsel has made numerous attempts to obtain AUSA Hartman's notes to corroborate her knowledge of Crittenton's possible liability as told to her by Plaintiff.  On October 20, 2017, the US Attorney's Office for the Eastern District of Michigan declined Plaintiff's Touhy request to obtain all materials created by the Department of Justice concerning meetings with Plaintiff.

**Alternate Remedy**

22.    Under the FCA, 31 U.S.C. § 3730 (c)(5), "The Government may elect to pursue

its claim through any alternate remedy available to the Government, including any

administrative proceeding to determine a civil money penalty." This language in the federal

False Claims Act parallels the legislative intent of the law, meant to provide financial

incentives and encourage potential whistleblowers to step forward and expose fraudulent

activity. Plaintiff contends that the penalties Crittenton paid to HHS-OIG serve as an Alternate

Remedy, as the disclosures match the information Plaintiff provided to the Department of

Justice at an earlier date.

23.    The Supreme Court ruled that a Plaintiff is entitled to a share of criminal

forfeiture proceedings arising out of a criminal prosecution. The Court found that the statutory

language allowing the United States to "pursue its claim through any alternate remedy," means

that the statute "unambiguously places no restriction on the alternate remedies available to the

United States." *United States v. Bisig,* 2005 U.S. LEXIS 38316, at *6 (S.D. Ind. 2005).  The

Court noted that Congress' purpose in amending the FCA "was to encourage more private

enforcement suits" and that "only a **coordinated effort** of both the Government and the

citizenry will decrease this wave of defrauding public funds." *Id.* at *6-7 (citing S. Rep. No.

99-345, at 23 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5288-89 and S. Rep. No. 99-345, at 2

(1986), *reprinted in* 1986 U.S.C.C.A.N. at 5267). [Emphasis added]

24.    *Bisig* illustrates the Congressional intent to (1) encourage the filing of *qui tam*

cases and (2) to widely interpret the meaning of "alternate remedy" under 31 U.S.C. § 3730

(c)(5) to encompass a wide variety of relief to incentivize potential whistleblowers to come

forward. If the government were to bar Plaintiff 's claim based on not classifying the penalties

paid to HHS-OIG as an *alternate remedy*, despite Plaintiff's providing the information that pre-dated the disclosures, the decision would be inconsistent with the express intent of Congress.

### Conclusion

25.   Plaintiff is entitled to an additional award stemming from Crittenton's 2015 disclosures to HHS-OIG, as an Alternate Remedy under the law.

26.   Crittenton self-disclosed Crittenton's improper conduct and resultant overpayments over a year after the improper conduct and overpayment in question should have been identified, long after the 60-day overpayment window. Fata's relationship with Crittenton should have alerted Crittenton to the retained overpayments immediately; instead, it took Crittenton over a year to self-disclose the overpayments. It is relevant to note that if the disclosing party fails to conduct an overpayment inquiry "with reasonable speed," the disclosing party could be viewed as having knowingly retained the overpayment on the grounds that it had "acted in reckless disregard or deliberate ignorance" of an overpayment. *See* 77 F.R. 9181.

27.   Additionally, according to the Office of Inspector General self-disclosure protocol, although "disclosing parties already subject to a Government inquiry (including investigations, audits, or other oversight activities – or in this case, a *qui tam* case) are not automatically precluded from using the self-disclosure protocol… it must be made in good faith and must not be an attempt to circumvent any ongoing inquiry." OIG's Provider Self-Disclosure Protocol, published April 17, 2013, page 3. Crittenton, aware of Fata's arrest and indictment, intended to circumvent ongoing inquiries surrounding Fata and his connections with Crittenton.

28.     Ultimately, from a self-disclosure <u>and</u> over-payment perspective, Defendant Crittenton simply disclosed too late. Crittenton's due diligence was certainly motivated by Plaintiff Karadsheh's *qui tam* case against Fata.

29.     Plaintiff has diligently assisted the government for almost five years and has done the public an invaluable service and should be justly compensated for his courage and information.

### **Relief Requested**

Plaintiff respectfully requests that this Court enter judgment against the United States in the amount of $980,000, plus attorney fees and costs and other relief to which he is entitled.

April 20, 2018

/s/ David L. Haron
David L. Haron (MI P14655)
Maro E. Bush (MI P71930)
Haron Law Group, PLC
30300 Northwestern Highway
Suite 115
Farmington Hills, MI  48334
(248) 539-7420

dharon@haronlawgroup.com
mbush@haronlawgroup.com
Attorneys for Plaintiffs

## **DEMAND FOR JUDGMENT**

Plaintiff demands a judgment against the United States on all claims alleged herein, in the

amount of $980,000 dollars.

April 20, 2018

/s/ David L. Haron
David L. Haron (MI P14655)
Maro E. Bush (MI P71930)
Haron Law Group, PLC
30300 Northwestern Highway
Suite 115
Farmington Hills, MI 48334
(248) 539-7420
dharon@haronlawgroup.com
mbush@haronlawgroup.com
Attorneys for Plaintiff